MWG:DKA

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | COMPLAINT AND AFFIDAVIT IN SUPPORT OF ARREST WARRANT |
| - against - | |
| BOND NG, | (18 U.S.C. § 2422(a)) |
| Defendant. | No. 26-MJ-40 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      Kristen Maharaj, being duly sworn, deposes and states that she is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations, duly appointed according to law and acting as such.

      On or about and between December 22 and 30, 2025, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant BOND NG did knowingly and intentionally persuade, induce, entice, and coerce one or more individuals to travel in interstate commerce to engage in prostitution.

      (Title 18, United States Code, Section 2422(a))

The source of your deponent's information and the grounds for her belief are as follows:[1]

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"). I am assigned to the Human Exploitation and Trafficking Team ("HEATT"). During my tenure with HSI, I have participated in the investigation of cases involving sex trafficking, sexual exploitation, and offenses involving transportation and travel to engage in prostitution. I have conducted physical surveillance, executed search warrants, reviewed and analyzed electronic devices, and interviewed suspects and witnesses. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in sex trafficking crimes to conceal their actions from detection by law enforcement.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of evidence in the investigative file; and my conversations with and reports from other law enforcement officers involved in the investigation.

3. On or about February 20, 2026, at approximately 9:00 p.m., the defendant BOND NG arrived at John F. Kennedy International Airport (hereinafter, "JFK Airport") on an international flight from Cartegena, Colombia. NG was flagged and referred for a secondary inspection. He sat for a voluntary interview with HSI agents, in which he was read and waived his *Miranda* rights.

---

[1] Because the purpose of this complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

4.  In his interview with HSI agents, NG stated, in sum and substance, that he was the "manager" of a person (hereinafter, "Person-1"), who, he stated, performs in pornographic videos on an online website. NG stated, in sum and substance, that he helps facilitate meetings between Person-1 and her "fans" in different locations, including in New York and elsewhere. NG stated, in sum and substance, that he coordinates these meetings and, at times, allows Person-1 to use his apartment for the meetings. NG stated that his apartment is located in Queens, New York. He stated that Person-1 has a residence in Los Angeles, California.

5.  When NG landed at JFK Airport on or about February 20, 2026, he was carrying two cellular telephones (hereinafter, "Device-1" and "Device-2"). NG provided consent for HSI agents to seize and review these devices. I have reviewed portions of these devices, pursuant to NG's consent.

6.  Device-1 contains a number of text-message conversations with individuals who appear to be the "fans" of Person-1. In these conversations, NG offered the "fans" prices for sexual intercourse and other forms of sexual activity with Person-1. He provided these individuals with addresses where they could meet up with Person-1 to engage in this sexual intercourse and sexual activity. In these messages, NG appeared to be pretending to be Person-1.

7.  For example, in one text-message conversation on Device-1, NG exchanged messages with a client who identified himself as located in "NY," or New York. NG

3

stated to the client that Person-1's "rate" was "2k per hour," or $2,000 per hour, and that "anal," or anal intercourse, was "$500 extra." A photograph of this conversation is included below.[2]



8.  In another conversation on Device-1, NG provided information to another client about Person-1's rates for different forms of sexual activity. NG stated that Person-1's rate was "$2000/hr," or $2000 per hour; that "[a]nal," or anal intercourse, would cost an "additional $500"; and that "[b]areback," or sexual intercourse without the use of a condom or other barrier-based protection, would cost another $500. NG stated that "[b]areback" sex, or sexual intercourse without the use of a condom, would also require the client to obtain a "full

---

[2] This photograph and the others that appear in this affidavit have been redacted to obscure the names and identities of Person-1 and other third parties.

panel test with online test results to show in person," which, from my training and experience, I believe refers to a panel of tests for sexually transmitted diseases. In response, this client stated that he would like to meet with Person-1 "for an hour," and the client provided information about the tests for sexually transmitted diseases that he had undergone. A photograph of this conversation is included below.



9. Apart from the fact that NG was carrying Device-1 when he was interviewed at JFK Airport, at least one other text-message conversation on Device-1 provided an indication that NG (not Person-1) was the user of that device. In this text message on

Device-1, NG told a client that the client should deposit money into a Zelle account with the account name "Bond Ng."³  "Bond Ng" is the full name of NG.

10. As to Device-2, the second cell phone that NG was carrying when he was interviewed at JFK Airport, I have also reviewed portions of this device. Device-2 contains a lengthy thread of text-message conversations with Person-1, whose name I have learned in the course of this investigation. In these messages, which date as early as 2021, NG appeared to be coordinating Person-1's meetings with clients for sexual activity. In the messages, NG provided instructions to Person-1 as to the names of the clients who would be meeting with her; the amount of money that the clients owed; the type of sexual activity the clients were expecting; and the locations where Person-1 would meet with the clients.

11. For example, in one text-message exchange between NG and Person-1 on Device-2, NG asked Person-1 how a meeting with a recent client was. Person-1 responded, "He fucked me for 3 hours". NG responded, "no way", and Person-1 stated, "He usually one time then just talk". Person-1 later stated to NG, "It's not super hard but he fuck me 3 hour. Maybe 30 min break total". NG responded, "he got his money's worth".

12. On or about December 22, 2025, NG messaged Person-1 on Device-2, asking Person-1, "[A]re you going anywhere else this week or will be in La?" Person-1 responded, "I will be here in LA". Based on my training and experience, I believe that "La" and "LA" refer to Los Angeles, California, meaning that Person-1 was located in Los Angeles at the time. NG then asked if Person-1 would travel from Los Angeles to New York to engage in sexual activity with one of Person-1's clients (hereinafter, "Client-1"). NG stated that he

---

³ Zelle is a digital payment system that allows users to send and receive money to and from each other.

6

understood that Person-1 "hate[s] the cold" in New York—but, NG stated, Client-1 was asking to meet with Person-1 for seven-and-a-half hours, and Client-1 had already made an initial deposit of $10,000 into NG's Zelle account.   NG and Person-1 then engaged in the following text-message exchange:

> Person-1: Where am I staying?
> Who else is going to fuck me
>
> NG: i didn't ask anyone yet but i have a few deposits from old clients. if you want to come i can definitely get you more clients
> but wasn't sure if you willing to come
> i will book hotel for you in manhattan to sleep
> since you get sick from your coop and my apartment smells bad for you
>
> Person-1: Who else is booked?
> i don't want to go there so cold and no client
> I go for two days
>
> NG: I started to text old clients who gave deposits.   im also going to reach out to more clients tomorrow morning and i give you an update tomorrow night.

13.   In my training and experience, Person-1's question, "Who else is going to fuck me" indicates her and NG's understanding that Person-1 would be traveling from Los Angeles to New York to engage in sexual intercourse or other forms of sexual activity.   NG's references to "deposits," furthermore, refer to his and Person-1's understanding that Person-1 would perform sexual intercourse and other forms of sexual activity in exchange for money, after she arrived in New York.

14.   Approximately three days later, on or about December 25, 2025, NG text-messaged Person-1, stating, "This is what I have so far" and providing a list of meetings that NG had arranged for Person-1 over the following days.   The text message included information about the amount of money that each client owed and the sexual activity that each client had

7

requested. These types of sexual activity included references to "bare," or "bareback" sexual intercourse, which I understand to mean sexual intercourse without a condom or other form of barrier-based protection, and "anal," which I understand to mean anal intercourse. Following this message, Person-1 responded, "Ok." A photograph of this text message is included below:



15.     Between approximately December 25 and 27, 2025, NG text-messaged with Person-1 to coordinate further details relating to Person-1's travel to New York, including the names of different clients with whom Person-1 would meet and the sexual activity in which the clients had asked to engage.

16.     Person-1, at one point, on or about December 27, 2025, expressed reluctance about coming to New York in the following days, due to a winter storm that was

8

shortly expected to arrive. Person-1 stated to NG, "Wait do I have to go this weekend ?" / "Is it possible I go Wednesday Thursday Friday Saturday" / "The weather is soooo bad." Person-1 then sent NG a number of news articles about a snowstorm expected in the New York City area. Person-1 later stated, before NG sent a text message in response, "Don't cancel client I will go tonight" / "I want get New York trip over with it".

17. At a point in the preceding days, NG had arranged to pick up a winter coat for Person-1 from a residence of Person-1 in New York. On or about December 27, 2025, NG also sent Person-1 an electronic payment for $1,000 via Apple Pay, a mobile payment service.

18. On or about December 28, 2025, Person-1 stated in a text-message to NG that she had arrived in New York on a flight. Later, throughout the day on or about December 28 and 29, 2025, NG provided information to Person-1 about the clients whom Person-1 was meeting, including the clients' times of arrival and the amount of money that the clients owed.

19. On or about December 30, 2025, Person-1 messaged NG, stating that she was leaving New York on a flight back to California. Person-1 provided NG with her flight number, and NG sent, in response, a screenshot from the flight airline's website, showing the flight's status and estimated time of arrival. The screenshot showed that the flight was one from JFK Airport to Los Angeles International Airport, in Los Angeles, California. Person-1 later stated that she had landed in Los Angeles.

20. Text messages between Person-1 and NG during this time make clear that Person-1 used an apartment belonging to NG in Queens, New York, within the Eastern District of New York, for at least one of her sexual meetups with her clients. Among other things:

9

a.  At one point, on or about December 29, 2025, NG stated to Person-1, in a text message on Device-2, that a certain client (hereinafter, "Client-2") would shortly be arriving. In a text message on Device-1 to a person with the same name as Client-2, NG instructed this person to ask for a woman in "apartment 9c" at "building 2JP 28-30." From my searches of publicly available information, I believe that "building 2JP 28-30" refers to 2 Jackson Park, which is an apartment building located at 28-30 Jackson Avenue, Queens, New York. This address, 2830 Jackson Avenue, Apartment 9C, is the one that NG provided to HSI agents when they interviewed him at JFK Airport on or about February 20, 2026.

b.  On or about December 29, 2025, in text messages from NG to Person-1 on Device-2, NG stated that Client-2 had requested "one hour anal," or one hour of anal intercourse with Person-1. NG asked if Person-1 could wear a "butt plug," and NG stated, "The dildos is [*sic*] on the top drawer above the dishwasher." From my training and experience, I know that a "butt plug" and a "dildo" are objects that can be used for sexual stimulation or preparation for sexual activity. Additionally, from my knowledge of this investigation, I believe that the fact that NG instructed Person-1 to take such an object from a "drawer above the dishwasher" indicates that Person-1 was, at that time, located in a residence that belonged to NG.

c.  The following day, on or about December 30, 2025, when Person-1 stated that she was leaving New York on her flight to Los Angeles, Person-1

text-messaged NG on Device-2, stating "Thank you for letting me use your apartment."

21. Based on this information, I believe that between approximately December 22 and 30, 2025, NG persuaded, induced, and enticed Person-1 to travel in interstate commerce, from California to New York, to engage in prostitution.

WHEREFORE, I respectfully request that that an arrest warrant for the defendant BOND NG be issued so that he may be dealt with according to law. I further request that the Court order this application, including the affidavit and arrest warrant, be SEALED until further order of the Court. These documents discuss an ongoing criminal investigation. Disclosure of this application and these orders would seriously jeopardize the ongoing investigation, as such a disclosure would give the subject of the investigation an opportunity to change patterns of behavior, notify confederates, and/or flee from prosecution.

> KRISTEN K MAHARAJ
> Digitally signed by KRISTEN K MAHARAJ
> Date: 2026.02.21 18:14:31 -05'00'
>
> Kristen Maharaj
> Special Agent, United States Department of Homeland Security, Homeland Security Investigations

Sworn to before me this
22 day of February, 2026

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
THE HONORABLE PEGGY CROSS-GOLDENBERG
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK